# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ **FILED** DISTRICT OF _____ ILLINOIS, EASTERN DIVISION _____

UNITED STATES OF AMERICA

v.

PAWEL PIOTR WIELGUS

MAY 1 5 2008
5-15-08
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER: 08cr390

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __March 12, 2007__ in __Cook__ County, in the __Northern__ District of __Illinois__ defendant did

knowingly falsely make, forge, counterfeit, mutilate, and alter a Polish passport, and instrument purporting to be a Polish passport, with intent that the same may be used, and willfully and knowingly furnished to another for use such false, forged, counterfeited, mutilated, and altered passport and instrument purporting to be a Polish passport,

in violation of Title __18__ United States Code, Sections __1543 and 2__.

I further state that I am a __Special Agent of the Federal Bureau of Investigation__ and that this complaint is based on the following facts:

See attached Affidavit

Continued on the attached sheet and made a part hereof: __X__ Yes ____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

MAY 1 5 2008
Date

at Chicago, Illinois
City and State

Magistrate Judge Martin C. Ashman

Signature of Judicial Officer

STATE OF ILLINOIS    )
                     )  SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Jennie M. Werneck, Special Agent ("SA") of the Federal Bureau of Investigation (FBI), United States Department of Justice, Chicago, Illinois, being duly sworn, depose and state as follows:

1. I am an investigative and law enforcement officer of the United States, who is empowered by law to conduct investigations of criminal violations of federal laws, including, but not limited to 18 U.S.C. §§ 1543 and 2, forgery of and furnishing to another for use a false passport.

2. I am a Special Agent of the Federal Bureau of Investigation assigned to the Chicago Division and have been so employed since June 2002. Since July 2006, I have been assigned to the Eurasian Organized Crime Squad ("EOC"), which specializes in investigating federal crimes committed by Chicago European and Asian organized crime groups. Prior to my assignment with the FBI's EOC squad, I worked over three years on a narcotics squad specializing primarily in the investigations of Colombian and Mexican narcotics traffickers.

3. In my capacity as an FBI Agent, I have received special training in the enforcement of federal laws under the jurisdiction of the FBI to include but not limited to violations of Title 18. In connection with my official duties as an FBI Agent, I have participated in a wide variety of investigations to include but not limited to narcotics investigations, wire fraud, mail fraud, bank fraud, immigration fraud, illegal alien smuggling, and document fraud. My training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, and informants; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also received training and have extensive experience in investigations involving the interception of wire communications. I have been the Affiant on numerous Title III affidavits. Further, I have received training in testifying for judicial proceedings and prosecutions relating to violations of federal laws. I have also participated in numerous consensual searches and search warrants which have led to the substantial seizure of narcotics, firearms, and other items of evidence. Based on my training and experience as a FBI SA, I am familiar with the manner in which organized crime groups conduct their business, including the methods employed by members of organized crime groups to conceal their illegal activities, their use of telephones in furtherance of their illegal activities, and their use of coded language to disguise their criminal activities.

4. This affidavit is in support of an arrest warrant and complaint charging **PAWEL PIOTR WIELGUS** with forgery of and furnishing to another a false passport, in violation of 18 U.S.C. §§ 1543 and 2.

5. This affidavit is based on personal knowledge I have gained through the course of this investigation, which was conducted by the FBI and Immigration and Customs Enforcement ("ICE"), as well as my training and experience.

6. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the attached criminal complaint, I have not included each every fact known to me concerning this investigation. More, specifically, I have set forth only those facts that I believe are necessary to establish the required foundation of probable cause. In particular, I have not set forth all the conversations, or the content of all the conversations, between the Confidential Human Source ("CHS") and **WIELGUS** regarding the CHS's purchase of there herein-described counterfeit Polish passport from **WIELGUS**, or other possible transactions between the CHS and **WIELGUS**. Because the conversations between the CHS and WIELGUS were in Polish, for unrecorded conversations, your Affiant has relied upon the CHS's description of those conversations, and for recorded conversations, your Affiant has relied upon English translations of those conversations.

7. The FBI became aware of **WIELGUS'** criminal activities through a CHS. The CHS began cooperating with the FBI when the CHS went to the United States Embassy in Warsaw, Poland, and spoke to FBI Special Agents assigned to the FBI Office in Warsaw. The CHS provided specific information on the criminal activities of individuals from Poland then residing in the Chicago area. In April 2006, CHS provided information to the FBI Office in Warsaw, regarding a corrupt Foreign Service National ("FSN") working at the Canadian Embassy in Warsaw, Poland. The CHS reported that the FSN was accepting bribes in exchange for approving visas for individuals who did not qualify to obtain visas. This information led to the arrest of the FSN in Poland by the Warsaw Metropolitan Police Department of the Polish National Police ("PNP").

8. On October 12, 2006, the CHS arrived in Chicago, pursuant to a Significant Public Benefit Parole ("SPBP").[1] Given the CHS's productivity, the CHS's SPBP was extended for one year on February 5, 2007. Thereafter, on January 30, 2008, the CHS's SPBP was extended for another year, until January 29, 2009. On April 28, 2008, CHS was

---

[1] SPBP is a temporary measure used to support law enforcement efforts by providing a legal mechanism for aliens such as informants, witnesses, criminals and defendants, who are otherwise inadmissable, to be present in the United States so that they may assist with investigations, prosecutions, and other law enforcement activities.

charged with a misdemeanor assault occurring at his/her place of employment. CHS was issued an I-bond in the amount of $75.00 and was released pending a court appearance. To date, the CHS has been paid $850.50 for his/her expenses.[2] The information that has been provided by CHS has been corroborated in significant respects by independent investigation including: surveillances, controlled purchases of fraudulent documents, consensually recorded conversations, pen register data, and other CHSs.

9.   In or about November, 2006, the CHS began to report on **WIELGUS'** trafficking in fraudulent documents. **WIELGUS** additionally, told the CHS that he (**WIELGUS**) could arrange for the smuggling of individual into the United States. In December 2006, during consensually recorded conversations, the CHS told **WIELGUS** that he needed a Polish passport for a friend, and **WIELGUS** quoted the CHS a price of $1,500.00 for a fraudulent Polish passport.

10.   On January 11, 2007, in a consensually recorded conversation, the CHS met with **WIELGUS** to give him the photographs but, because **WIELGUS** said that the photographs were the wrong size, the CHS left without giving him either the money or the photographs. During the meeting, **WIELGUS** used his telephone to contact an unknown individual to ask the exact specifications of the photographs needed.[3] Later that same day, the CHS again called **WIELGUS** and, in a consensually monitored telephone conversation, **WIELGUS** confirmed the exact specifications of the photographs needed.

11.   On January 18, 2007, during a consensually recorded meeting (audio/video) that was surveilled by the FBI, the CHS provided **WIELGUS** $1,500.00 in cash and passport photographs for the CHS's "friend."[4] The FBI searched the CHS prior to the meeting and found that the CHS had only the $1,500.00 in cash, and searched him/her after the meeting, and did not find any cash on him/her.

12.   On February 7, 2007, the CHS reported to the FBI that **WIELGUS** telephonically contacted the CHS to tell the CHS that the photographs that the CHS provided

---

[2]   This payment was reimbursement for an airline ticket.

[3]   This was verified by listening to the recording which contained both audio and video. Additionally, a review of **WIELGUS'** toll records reveals an outgoing call at the same approximate time that the recording revealed him making a call.

[4]   The photographs that the CHS provided to **WIELGUS** were of a FBI Special Agent.

were damaged by the people in Poland making the passport.[5] This conversation was not recorded, but immediately thereafter was reported to the handling agent. **WIELGUS** requested that the CHS provide new photographs. On February 9, 2007, the CHS met with **WIELGUS** and delivered to him a new set of photographs for the Polish passport.

13.     On March 12, 2007, the CHS participated in a consensually recorded meeting with **WIELGUS** (audio/video) that was surveilled by the FBI. Prior to this meeting, the CHS contacted **WIELGUS** on **WIELGUS'** telephone to confirm this meeting. Prior to the meeting, the CHS was searched with negative results. During the meeting, **WIELGUS** gave the CHS the counterfeit Polish passport. During this meeting, **WIELGUS** also told the CHS that the cost of the counterfeit passport had increased $120.00, which consisted of a $100.00 charge because of the cost increase, and a $20.00 charge for shipping. The CHS told **WIELGUS** that he/she would take the passport and negotiate the price increase with the CHS's client (the CHS's "friend"). At the conclusion of this meeting, the CHS gave the counterfeit Polish passport **WIELGUS** had given him/her to FBI Special Agents, and they subsequently placed it into evidence.

14.     I have examined the passport **WIELGUS** provided the CHS, and it is described as a blue-covered purported Polish passport with an Eagle symbol on the front. Inside, is a photograph of the purported passport holder, which is the photograph of the FBI Special Agent that the CHS provided **WIELGUS** on January 18, 2007. Also inside the purported Polish passport are various stamps indicting entry into or exit from various countries. A photocopy of this passport is attached as Exhibit A.

---

[5]     According to the CHS, **WIELGUS** only contacts the CHS from his telephone known to the CHS as (773)541-0361. A review of **WIELGUS'** phone records confirms an outgoing call to the CHS on February 7, 2007.

4

15. Based upon the above, the affiant believes that there is probable cause to believe that **PAWEL PIOTR WIELGUS** has committed the crime of forgery of and furnishing to another a false passport, in violation of 18 U.S.C. §§ 1543 and 2.

FURTHER THE AFFIANT SAYETH NOT

_____
Jennie M. Werneck, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO ME BEFORE
THIS 15th DAY OF MAY, 2008.

_____
MARTIN C. ASHMAN
MAGISTRATE JUDGE



Exhibit A



**DZIECI / CHILDREN**

NAZWISKO/
SURNAME

IMIĘ/
GIVEN NAME

DATA URODZENIA/
DATE OF BIRTH

PŁEĆ/
SEX

**Ograniczenia ważności paszportu.**

Restrictions in the validity of this Passport.

Restrictions de la validité du passeport.

Ограничения действительности паспорта.

**Każdy, kto znajdzie ten paszport proszony jest o przekazanie go najbliższej ambasadzie lub konsulatowi Rzeczypospolitej Polskiej, a w Polsce jednostce Policji.**

Any Person finding this Passport is kindly requested to return it to the nearest Embassy or Consular Office of the Republic of Poland or to a Police Station when in Poland.

Quiconque trouvera ce passeport est prié de bien vouloir le remettre à l'Ambassade ou au Consulat de la République de Pologne le plus proche, ou sur le territoire de Pologne, à un commissariat de police.

Просьба к каждому, кто найдет этот паспорт, передать его в ближайшее посольство или консульство Польской Республики, или в Польше - в любое отделение полиции.

## POUCZENIA

1. Paszport jest dokumentem urzędowym uprawniającym do przekraczania granicy i pobytu za granicą oraz poświadczającym obywatelstwo polskie, a także tożsamość osoby w nim wskazanej, w zakresie danych, jakie dokument ten zawiera.

2. Paszport wydaje się na jedną osobę. Może obejmować także wpisane na stronie 2 dzieci do lat szesnastu, jeżeli odbywają podróż pod opieką posiadacza paszportu.

3. Paszport ważny jest przez 10 lat od daty jego wydania. Utrata ważności paszportu nie pozbawia jego posiadacza prawa przybycia na podstawie tego paszportu na terytorium Rzeczypospolitej Polskiej.

4. Paszport ważny jest na wszystkie kraje świata i uprawnia do wielokrotnych przekroczeń granicy chyba, że jego ważność została ograniczona co uwidoczniono na stronie 3.

5. Paszport unieważniony na podstawie decyzji uprawnionego organu podlega zwrotowi organowi paszportowemu.

6. Paszport zawierający wady, uniemożliwiający stwierdzenie tożsamości osoby albo co do którego istnieje uzasadnione podejrzenie, że został podrobiony lub przerobiony albo unieważniony nie uprawnia do przekroczenia granicy. W takim przypadku paszport może zostać zatrzymany.

7. W razie utraty paszportu w kraju należy niezwłocznie powiadomić organ paszportowy lub Policję, a za granicą najbliższą ambasadę lub konsulat Rzeczypospolitej Polskiej.

WIZY / VISAS / VISAS

5





